IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


AKEEM PAGE-JONES, LE-6014,      )
     Petitioner,              )
                             )
        v.                  )    2: 17-cv-1578
                             )
JOHN E. WETZEL, et al.,        )
     Respondent.            )


MEMORANDUM OPINION and ORDER


Akeem Page-Jones an inmate at the State Correctional Institution-Camp Hill- has presented a petition for a writ of habeas corpus (ECF No. 3) which he has been granted leave to prosecute in forma pauperis. For the reasons set forth below the petition will be dismissed and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability will be denied.

Page-Jones is presently serving a sixty years to life sentence imposed following his conviction by a jury of criminal homicide, arson-danger of death or bodily injury, arson-inhabited building or structure, possession of a firearm by a minor, theft by unlawful taking-movable property and recklessly endangering other persons at No. CP-02-CR-4298-2011 in the Court of Common Pleas of Allegheny County, Pennsylvania. This sentence was imposed on August 26, 2013.[1]

An appeal was filed in the Superior Court in which the questions presented were:

    I.     Did the lower court abuse its discretion when it admitted
           inflammatory photographs of the victim's autopsy, causing
           unfair prejudice against Mr. Page-Jones?

    II.    Is Mr. Page-Jones' sentence unconstitutionally cruel and
           unusual punishment, as juvenile defendants must have some
           reasonable ability to gain parole?

---

[1] See: Petition at ¶¶ 1-6.

III.   Did the Commonwealth present insufficient evidence to prove
       beyond a reasonable doubt that Mr. Page-Jones caused the
       death of Ms. Williams and did not act under duress?[2]

On November 16, 2015 the judgment of sentence was affirmed and leave to appeal was denied

by the Pennsylvania Supreme Court on March 29, 2016.[3]

On August 26, 2016, Page-Jones executed a post-conviction petition. That petition was

dismissed on April 4, 2017 and no appeal was pursued.[4]

The instant petition was received in this Court on December 5, 2017 and an amended

argument was file on July 16, 2018 (ECF No.18). In his petition, Page-Jones contends he is

entitled to federal habeas corpus relief on the following grounds:

1.  The trial court abused its discretion when it admitted
    inflammatory photographs of the victim's autopsy causing unfair
    prejudice against petitioner.

2.  Petitioner received a de facto life sentence which is
    unconstitutional cruel and unusual punishment as juveniles must
    have some reasonable ability for parole.

3.  The Commonwealth presented insufficient evidence to prove
    beyond a reasonable doubt that petitioner caused the death of the
    victim and did not act under duress.

4.  Ineffective assistance of trial, direct appeal and PCRA counsel[5]

The background to this prosecution is set forth in the December 19, 2014 Opinion of the

trial court:

> Theresa Williams Dawson, mother of the victim Teesa Williams,
> testified that on March 22, 2011, Dawson left her home at 6:15 a.m. to
> go to work. Dawson's seventeen-year-old mentally retarded daughter,
> Teesa, remained at home to await the school bus, per their normal
> routine. At 6:25 a.m., Teesa called Dawson to say she was on the bus.
> Dawson did not believe her because she could not hear in the
> background any other children's voices. Later that morning she
> received a call from Teesa's school indicating that a neighbor had
> reported the Dawson's house was on fire. Although one of the police
> officers on scene originally told Dawson that Teesa was fine. Teesa
> did not survive the fire.

---

[2]  See: Exhibit 4 to the answer at p.6.
[3]  See: Exhibits 5 and 6 to the answer.
[4]  See: Exhibit 1 to the answer at p.12.
[5]  See: Petition at ¶ 12 and amended issues (ECF No. 18).

Dawson further testified that her living room television had cable box, a DVD player, and a month old PlayStation 3 video game system. Dawson was shown pictures of her home after the fire and she testified that the television was moved away from the wall and some dried flowers and twigs were missing from a vase near the front door. Dawson was later shown a picture of a purse and identified it as belonging to her and located in her home prior to the fire.

Penn Hills Police Officer Andrew Kolek testified that he was dispatched to 11276 Azalea Street at 9:47 a.m. for a report of heavy smoke coming out of the house. Officer Kolek was the first to arrive at the scene and he attempted to determine if anyone was inside. Although the front door was locked, the officer gained entry via a side door that was left a few inches ajar. Officer Kolek entered the kitchen, yelled 3-4 times to determine if anyone was further inside, but was quickly forced to retreat due to the intense heat of the fire and his lack of protective equipment.

Greg Renko, a volunteer firefighter for fifteen years, most recently with the Penn Hills Fire Department, testified that he was dispatched at 9:48 a.m. to Azalea Drive and he arrived at the scene seven minutes later, at 9:55. While searching the home for individuals who may have been trapped inside, he found the victim, Teesa Williams, face down on the floor of the last bedroom on the first floor. He testified to observing an increased heat intensity and very dark, thick smoke emanating from that room. Teesa had visible burn marks on her back and shoulder blade and her underwear had been pulled down to her thighs. Renko carried her out of the building, and once safely outside, laid her down on her back. He then observed trauma to Teesa's face. Teesa appeared to be unconscious and not breathing when Renko got her outside and turned her over to medics for treatment.

Renko returned to the bedroom and observed a bloody pillow on the floor where Teesa had been and a bloody handprint on a dresser nearby. Renko observed charring on a rug on the floor, and embers smoldering on the floor to the right hand side of the bed closest to the closet door. As he extinguished the smoldering item, he observed it to be a roll of paper towels…

Sean Gongaware, a volunteer firefighter … testified that he also went inside the Azalea Street residence and entered the bedroom at the end of the hall. As part of his secondary search, he found a pile of debris in the bedroom. While he was moving around the pile, which appeared to be clothing and blankets, a roll of paper towels spontaneously reignited.

Deputy Fire Marshall Michael Liko… testified as an expert witness… He determined that the fire originated in the kitchen on the right hand side of the natural gas stove… He further determined that the cause of the fire was incendiary, meaning that it was intentionally set. In his expert opinion, the fire was set with some sort of combustible material on the countertop, such as paper towels, napkins or a dishtowel.

Chief Deputy Fire Marshal Donald Brucker testified that …looking into the bedroom, he observed remnants of burned paper towels and twig material… A burned afghan blanket and a bloodstained pillow were also on the floor. He determined that the origin of the fire in the bedroom was the floor, and the cause was incendiary… He testified that the fire damage to the bedroom was a result of an open flame being applied to material which was subsequently applied to the victim.

Detective Timothy Langan testified that he was called to the scene after the victim was found in the home. While processing the scene, Detective Langan observed a spent .22 caliber casing on a crumpled pair of women's jeans on the bedroom floor next to the victim's bed. He also found a small bullet hole in the lower portion of the closet door… In addition, Detective Langan recovered a cell phone from on top of the bed.

Linda Beaudry, a neighbor of the victim, testified that on the day of the fire, she saw a boy walking down an adjacent driveway carrying a purse that had a video game system sticking out the top… She described the boy as clean cut, somewhat large build and approximately in his late teens. She further testified that she saw no one with him.

Detective Anthony Perry… testified that with consent … he and other officers searched Appellant's residence… Detective Perry found a tan Dolce and Gabanna purse inside the file cabinet and … [it] was retrieved. Appellant and his Grandmother denied knowledge or ownership of the purse…

Joseph King testified that in 2011 he owned a .22 caliber pistol which he had purchased off the streets… The day before Tessa died, King and Appellant were trying to repair the gun. Appellant volunteered to test fire the gun in the woods. After Appellant left King's house with the gun, Appellant called King and told him that Appellant had fired two shots and then the gun jammed. Instead of returning the gun to King, Appellant told King … that someone had seen him shoot the gun so he would return it in the morning.

The following day, King first found out about the fire and Teesa's death… King called Appellant to tell him about Teesa because Appellant had told King the day before that he was having a sexual relationship with Teesa… An hour or two later, Appellant went to King's home and sold him a PlayStations 3 video game system… From there, King's uncle took the PlayStation to his girlfriend's house, where the police eventually recovered it. When he brought over the PlayStation, Appellant also returned the gun and told King that one of the bullets was missing. Later that same day, King sold the gun to Maclain Cupid. Cupid confirmed in his testimony that he purchased a gun and ammunition from King that day. Cupid gave the gun to one of the homicide detectives…

After Appellant's arrest two days later, Detective Matthews conducted a second interview of Appellant. This time Appellant's grandparents and his biological mother were present. At this interview Appellant admitted that he had bragged to King about having a sexual relationship with Teesa. He further admitted to having King's gun and firing it twice the night before Teesa's death…

Detective Matthews testified that Appellant told him during this interview that on the morning of Teesa's death …[he] knocked on King's door with the intent to return the gun. When King did not answer, Appellant went to Teesa's home. Appellant said that Teesa let him in, and a black male in his 20's who Appellant did not know was already in Teesa's living room. Appellant claimed this unknown individual somehow obtained the gun, shot Teesa in the hallway outside of Appellant's line of sight, dropped the gun and ran out of the house. Appellant said he then picked up the gun, placed it in a purse and left the residence as well…

Appellant, in his third explanation to police, indicated he had acted alone and no unknown black male had been in the residence. Appellant told the detective that Teesa was obsessed with wanting to hold the gun, that a struggle ensued, and the gun went off one time. Appellant decided to set her on fire, so he took an afghan and laid it across the right side of her body. He said that he took some dried weeds or flowers and used the stove in the kitchen to ignite them. He specifically indicated that he used the back right burner to ignite the dried flowers and also pile some flammable items on the stove to try to burn the house down. He said that it took several attempts to light the afghan on fire, and that he observed Teesa flinch as she felt the pain of the flames from the torch-like dried flowers against her skin. He said that he found a purse in the mother's bedroom and used it to carry the PlayStation and a few video games out of the residence when he left.

Homicide Detective Patrick Miller obtained the subscriber information and call detail logs from Teesa's phone, which had been recovered from her bed. According to those records, on the night before her death, several calls or texts were sent from Appellant's cell phone to Teesa's cell phone. The cell phone exchanges continued the next morning. The last contact from Appellant to Teesa was a call at 6:30 a.m. on the morning of her death. Detective Miller testified that the records indicate that at 9:30 a.m., Hoye also texted Teesa.

Pamela Woods, an employee of the Allegheny County Medical Examiner's Office, and an expert in forensic science with regard to trace evidence, testified that fibers taken from Teesa's esophagus and stomach were consistent with the burnt flowers recovered from the scene. Daniel Wolfe, from the same department, testified as an expert in forensic science, specifically gunshot residue, that based on his analysis of the gunshot residue kit, no particles associated with gunshot residue were detected on Teesa's hands. Wolfe testified that the results were inconclusive, meaning that because residue was not found on Teesa's hands, he could not conclude that her hands were in close proximity to the firearm when it went off, thus refuting Appellant's story about a struggle over the gun.

Dr. Karl Williams, Chief Medical Examiner of Allegheny County, testified that he performed an autopsy of Teesa. He stated that Teesa had a gunshot wound going from under her chin upward, fracturing the mandible before exiting the head lateral to the right eye. After examining skin tissue around the entry wound under a microscope, he determined from the presence of gunshot residue that the barrel of the gun when it was discharged was against the skin surface. Additionally, micro tears surrounding the entrance wound support the conclusion that Teesa was shot at close range. He also opined that the gunshot wound alone would not have been fatal, as the bullet never entered Teesa's brain. Dr. Williams testified that Teesa was alive when the fire started, because he found soot lining her upper airways, trachea and upper parts of her lungs. Teesa's carbon monoxide saturation level was recorded at 40 percent, which was high enough to indicate both that she was alive when she was exposed to a flaming object, and that the fire and resulting smoke were significant contributory causes to her death, along with blood loss and the resulting filling of her lung with blood.

Raymond Everett, from the Allegheny County Office of the Medical Examiner testified as an expert in firearms and tool marks, specifically bullet trajectories. He testified that based on the trajectory the bullet must have travelled, it was not plausible in this case for two people to have struggled over a gun and the gun to have discharged

6

accidentally. Conversely, a plausible explanation would be that the shooter was standing behind the victim with the victim bent over. He was also able to determine that the .22 caliber pistol recovered and examined was operable but in poor condition. He determined the cause of death to be a combination of the gunshot wound causing blood loss and the pooling of blood in Teesa's lungs along with smoke inhalation. The manner of death was homicide.

Appellant testified in his own defense. He admitted that he lied to police and gave them numerous accounts of the events which transpired. He stated that he did so because he was afraid of King, whom Appellant said was the real assailant. Appellant said he was present during the shooting and that King had threatened to kill Appellant and his family if he didn't cooperate by giving King a burning afghan to throw on Teesa and by taking the Play-Station afterwards. He admitted that he called King ten times after Teesa's death, and later that afternoon went to King's house, despite Appellant's assertion that King had threatened to kill him. (record references omitted).[6]

While the respondents allege that the instant petition is untimely by three days, nevertheless "given the narrow window, respondents will also address the merits of the claims."[7] We likewise will do the same.

Petitioner's first claim is that the trial court abused its discretion in admitting inflammatory photographs of the victim. This issue was raised in his direct appeal and is properly before this Court. Specifically, in his petition Page-Jones contends:

> The photographs that were admitted were of a 17-year-old victim. The photos were gruesome, explicit [and] highly prejudicial photographs. As the injuries shown in detail in the photographs [were] a sight no jury should have seen. The photos only inflamed the passions of the jury against petitioner when the jury deliberated for 45 minutes.

Admissibility of evidence is a matter of state law and not generally subject to review in federal collateral proceedings. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). See also: Swarthout v. Cooke, 131 S.Ct. 859 (2011). In reviewing this issue the Superior Court observed,

> The admissibility of photographs of a murder victim falls within the discretion of the trial court, and only an abuse of that discretion will constitute reversible error. An abuse of discretion occurs when a trial court, in reaching its conclusions, overrides or misapplies the law or

---

[6] See: Exhibit 3 to the answer at pp. 3 -12.
[7] See: Answer at p.14.

7

exercises judgment which is manifestly unreasonable or the result of partiality, prejudice, bias, or ill-will…

In this case, the three color photographs in question were of the victim lying on a steel table in the medical examiner's office…. Although the photos did not depict, as appellant avers, the victim in "mid-autopsy", they are, nevertheless, disturbing images which depict the victim's burned, bloody face and body…

[W]hile appellant claims that the photos did not assist the jury in any factual determination, we cannot agree. Rather, the photos were to help establish that appellant's confession (the version in which he stated he acted alone and attempted to set the victim on fire) was consistent with the physical evidence and to disprove his defense that the shooting occurred during a struggle for the gun.

Furthermore, we note that the trial court emphasized to the jury that its decision should not be influenced by emotion. Prior to the testimony of Dr. Williams regarding the exhibits, the trial court issued the following cautionary instruction:

> I do need to caution you, however, you may find these pictures to be disturbing and unpleasant to view, but you must not let them stir your emotions to the prejudice of the Defendant…

It is well-settled that "the jury is presumed to have followed the court's instructions." For the foregoing reasons, no relief is due on this claim. (citations and record references omitted).[8]

Accordingly, as a matter of state law the photographs were admissible and this determination is not entitled to further review here.

Petitioner's next contention is that the sixty years to life sentence imposed constitutes cruel and unusual punishment which when imposed on a juvenile denies him a reasonable expectation of parole.

As a general proposition, a state sentence is not subject to review in a federal habeas proceeding unless the sentence imposed exceeds that statutory maximum authorized. Bozza v. United States, 330 U.S. 160, 166 (1947); LaBoy v. Carroll, 437 F.Supp. 2d 260 (D.Del. 2006). However, in Miller v. Alabama, 567 U.S. 460, 479(2012) the Court held that "the Eighth

---

[8] See: Exhibit 5 to the answer at pp. 11-16.

Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."

Petitioner was born on September 3, 1994[9] and the homicide occurred on March 22, 2011 at which time the petitioner was 16 years old. Thus, he argues that he will be at least 70 years old before he becomes eligible for parole which effectively makes his 60 years to life sentence a life sentence. In reviewing this claim, the Superior Court wrote:

> Appellant contends that his lengthy term-of-years sentence poses the same constitutional questions for juveniles as the mandatory LWOP [life without parole] sentences struck down by the Supreme Court in **Miller**. He argues that a 60-year minimum sentence is unconstitutional because it is the "functional equivalent" of LWOP. We disagree. 18 Pa.C.S.A. § 1102.1(d), enacted in direct response to **Miller,** requires the trial court to consider the age-related factors espoused in **Miller**. Here, the trial court did exactly what it was required to do. It conducted an individualized sentencing hearing on August 26, 2013, during which it considered the factors set forth in **Miller** and Section 1102.1(d).[10]

Clearly, with full awareness of the Miller and statutory guidelines, while the court could have imposed a mandatory life sentence, the court gave the petitioner the ability to eventually gain his freedom. As such there is no basis for granting relief here.

Page-Jones' third argument is that the evidence was insufficient to sustain his conviction. In reviewing an insufficiency claim the court must look to whether or not the evidence was sufficient for any rational factfinder to determine guilt beyond a reasonable doubt. Coleman v. Johnson, 566 U.S. 650, 656 (2012). From the recitation of the factual background to this prosecution, it is abundantly clear that any rational factfinder could reach such a conclusion, and accordingly, this claim likewise does not present a basis for relief.

Petitioner's final claim is that trial and appellate counsel were ineffective "for failing to conduct a reasonable pre-trial investigation to challenge petitioner's self-incriminating statement."

---

[9] See: Exhibit 1 to the answer at p.2.
[10] See: Exhibit 5 at p.19. Interestingly, the trial court wrote that in imposing sentence with full recognition of both the statutory and Miller requirements, "having served on the bench for twelve years, this homicide stands out as one of the most horrific acts this Court has ever heard … still, this Court afforded Appellant a window of opportunity to show the Parole Board at some point that he deserves to regain his freedom and live out the balance of his life in the community … this Court did not sentence Appellant to a life sentence without possibility of parole, although the courts do retain the ability to do so post-Miller." See: Exhibit 3 at pp15-17.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court explained that there are two components to demonstrate a violation of the right to the effective assistance of counsel. First, the petitioner must show that counsel's performance was deficient. This requires showing that "counsel's representation fell below an objective standard of reasonableness." Id. at 688; see also Williams v. Taylor, 529 U.S. 362, 390-91 (2000). Second, under Strickland, the defendant must show that he was prejudiced by the deficient performance. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The Strickland test is conjunctive and a habeas petitioner must establish both the deficiency in performance prong and the prejudice prong. See Strickland, 466 U.S. at 687; Rainey v. Varner, 603 F.3d 189,197 (3d Cir.2010) cert. denied 131 S.Ct. 1673 (2011). As a result, if a petitioner fails on either prong, he loses. Rolan v. Vaughn, 445 F.3d 671 (3d Cir.2006).

Pennsylvania requires a claim of ineffective assistance of counsel to be raised in a post-conviction petition. Com.v. Bozic, 997 A.2d 1211 (Pa.Super), leave to appeal denied 608 Pa. 659, cert. denied 131 S.Ct. 2939 (2011). Post-conviction relief was not fully pursued and petitioner conceded that he did not exhaust the available state court remedies "because this is a new claim I am raising in the courts."[11]

In Coleman v. Thompson, 501 U.S. 722,750 (1991), the Court held:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice.

---

[11] See: Petition at p.11.

Because no such showing is made here, the petitioner has defaulted the available state court remedies on this issue and no further consideration is warranted here. [12]

Because petitioner has failed to make a showing that his conviction was secured in any manner contrary to the decisions of the United States Supreme Court or involved an erroneous application of those decisions, he is not entitled to relief here.

Accordingly, the petition of Akeem Page-Jones for a writ of habeas corpus will be dismissed and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of probable cause to appeal will be denied.

An appropriate Order will be entered.

Filed: November 5, 2018                            s/ Robert C. Mitchell
                                                   United States Magistrate Judge

---

[12] The record demonstrates that on November 21, 2011, counsel filed a petition for the appointment of an expert to determine if petitioner was "amenable to treatment, supervision and rehabilitation in the juvenile justice system." (Exhibit 10 to the answer). The petition was granted on January 2, 2012 (Exhibit 11 to the answer). Thus, there is no support for his allegation that counsel failed to investigate his mental condition.

ORDER

AND NOW, this 5th day of November, 2018, for the reasons set forth in the foregoing Memorandum, the petition of Akeem Page-Jones for a writ of habeas corpus (ECF No. 3) is dismissed, and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability is denied.

Pursuant to Rule 4(a) F.R.App. P. any  party seeking to file an appeal must do so within thirty (30) day of this date by filing a notice of appeal with the Clerk of the District Court, 700 Grant Street, Pittsburgh, PA 15219.


                                                        s/ Robert C. Mitchell
                                                        United States Magistrate Judge